UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **HERO NUTRITIONALS LLC,** | ) | **CASE NO. SACV 11-1195 AG (MLGx)** |
| Plaintiff, | ) ) ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | ) ) | |
| **NUTRACEUTICAL CORP., et al.,** | ) ) | |
| Defendants. | ) ) | |

This case is about whether two product lines of children's vitamins are confusingly similar. Plaintiff Hero Nutritionals LLC ("Plaintiff" or "Hero") sued Defendants Nutraceutical Corporation and Nutramarks, Inc., (collectively "Defendants" or "Nutraceutical") for trademark infringement and related unfair competition involving children's gummy vitamins. After reviewing the evidence presented during the bench trial and evaluating the credibility of witnesses and other evidence, the Court makes the following findings of fact and conclusions of law, including any factual findings interwoven with legal conclusions.

**FINDINGS OF FACT**

1. Hero is a manufacturer and distributor of vitamins and nutritional supplements throughout the United States and countries around the world.
2. Hero's first and flagship product is a nutritional supplement marketed as YUMMI BEARS brand gummy vitamins ("Yummi Bears"). These bear-shaped gummy vitamins were first introduced to the market in 1996.
3. Hero is the owner of a number of "YUMMI" trademark registrations for its gummy vitamins (collectively, the "Yummi Trademarks"), including YUMMI and YUMMI BEARS. The YUMMI and YUMMI BEARS trademarks are incontestable.
4. Hero has sold gummy vitamins under one or more of its Yummi Trademarks continuously since 1996.
5. From 1996 to 2006, Hero spent more than $3.5 million marketing and developing the Yummi Bears brand. Since 2007, Hero has spent more than $3 million in marketing and advertising, much of which was devoted to the Yummi Bears brand.
6. Hero's founder chose to use a "gummy bear" based on the popular Haribo gummy bear candies, and chose the term "yummi" based on the ordinary dictionary meaning of the word "yummy," to indicate that the Hero products are good-tasting.
7. Hero sells its YUMMI BEARS products primarily in specialty health and natural food stores such as Whole Foods and the Vitamin Shoppe.

| | | |
|---|---|---|
| 8 | | Both parties' products at issue are targeted and sold to similar consumers, namely health-conscious parents of young children. |
| 9 | | In 2002, when attempting to register its YUMMI BEARS mark with the U.S. Patent and Trademark Office (the "PTO"), Hero faced an "initial rejection" from the PTO based on an earlier registration for YUMMY CHOICE. In response, Hero argued that no likelihood of confusion existed between the marks, citing several third-party trademark registrations for "Yummy" or "Yummi", and concluding: |

> The fact that "YUMMY" or "YUMMI" is a component of so many cited trademarks . . . indicates that no one trademark owner can claim exclusivity in the term.
>
> [C]onsumers faced with an abundance of "YUMMY" and "YUMMI" marks should be able to look at the other elements of the marks to determine their sponsorship.

(Ex. 43 at 49-50).

10  Nutraceutical markets and sells nutritional supplement products, health and beauty products, and similar products throughout the United States, including children's nutritional supplement products.

11  In 1998, Nutraceutical first began using the word "Yummy" in connection with its YUMMY GREENS chewable children's nutritional supplement.

12  Before selecting the YUMMY GREENS mark, Nutraceutical commissioned a trademark search. The search revealed many Yummy and other Yum-formative marks owned by various parties, including Hero's YUMMI BEARS.

13  In 2001, Hero demanded that Nutraceutical stop using YUMMY GREENS, claiming a likelihood of confusion with YUMMI BEARS. Nutraceutical disagreed, and after additional correspondence between the parties that continued into 2002, Hero made no further objection to the YUMMY GREENS product.

14. Nutraceutical has sold the YUMMY GREENS product continuously from 1998 to the present.

15. Since at least 2006, Nutraceutical has been selling a line of children's vitamins under the KAL DINOSAUR trademarks, including a vitamin "C-Rex" product, a vitamin "D-Rex" product, and a multi-vitamin product called "Multi-saurus." At first, these products were only offered in hard chewable tablets.

16. In 2009, Nutraceutical introduced a gummy version of its KAL DINOSAUR C-Rex product. Nutraceutical retained the marks and designs as they were created in 2006 and added the words "Yummy Gummy."

17. The KAL DINOSAUR Yummy Gummy products are gummies in the shape of a bear.

18. In 2011, Nutraceutical added three additional gummy products to its KAL DINOSAUR line: "Vitamin D-Rex," "Multi-Saurus," and an "Elderberry" product. Like the Vitamin C-Rex product, these were pre-existing products, previously sold in a hard chewable tablet, now being offered in a gummy. Again, Nutraceutical retained the marks and design as they were created in 2006 and added the words "Yummy Gummy" under the product name.

19. Nutraceutical sells 5,000 units or less of each of its KAL DINOSAUR Yummy Gummy products annually.

20. Nutraceutical sells its KAL DINOSAUR Yummy Gummy products in specialty health and natural food stores only.

21. In 2011, approximately two years after Nutraceutical began selling its KAL DINOSAUR C-Rex Yummy Gummy product, Nutraceutical contacted Hero and expressed interest in acquiring or investing in Hero. Hero told Nutraceutical that it was not interested in a such a sale or investment.

22. Neither party has presented any evidence of actual confusion concerning the marks or products at issue here.

23  Hero did not conduct a survey to measure the existence or degree of confusion caused by Nutraceutical's KAL DINOSAUR Yummy Gummy products, nor has it conducted any survey to measure customer recognition of its YUMMI BEARS mark.

24  Besides the "Yummy" or "yummi" marks Hero cited in response to the PTO office action, and those revealed in Nutraceutical's 1998 trademark search, there is extensive third-party use of bear shapes, gummy forms, and "YUM"-formative marks.

25  Hero uses the YUMMI BEARS mark in this context: YUMMI is red and BEARS is yellow; YUMMI BEARS is outlined in white; YUMMI is spelled with an "i" instead of a "y" and uses a heart shape to dot the "i"; the label depicts cartoon bears; the background is generally a solid color with a sunburst emanating from behind the YUMMI BEARS mark; and Hero's registered house mark HERO is displayed in a green leaf design towards the top of the label.

26  Nutraceutical uses Yummy Gummy in this context: "Yummy" is yellow and spelled with a "y" instead of an "i"; there are pictures of dinosaurs and foliage but no bears; the background is a vertical gradient from white to light blue; the DINOSAURS mark is prominently displayed at the top; and Nutraceutical's KAL house mark is displayed at the bottom.

27  Some of the YUMMI BEARS bottles are packaged in boxes, the design of which looks substantially similar to the bottles. KAL DINOSAUR Yummy Gummy products are never sold in a box.

28  The YUMMI BEARS bottles are transparent. KAL DINOSAUR Yummy Gummy products are currently sold in opaque bottles. Prior KAL DINOSAUR Yummy Gummy bottles may have been more transparent.

29  On occasion, Nutraceutical has used advertisements called "shelf-talkers" that depict the bear-shaped gummies. These ads prominently feature the KAL and Dinosaur marks and the dinosaur theme.

30  Representative pictures follow of Hero's (on the left) and Nutraceutical's marks as used in the marketplace.

 

**CONCLUSIONS OF LAW**

The Court makes these conclusions of law, including any conclusions of law found in the Findings of Fact.

31 The Court has jurisdiction over the parties and subject matter of this case and venue is proper.

32 The registrations for YUMMI and YUMMI BEARS are "incontestable" under the Lanham Act, meaning that Hero's registrations for these trademarks are conclusive evidence of Hero's ownership of the marks and that the trademarks are valid and protectable. *See* 15 U.S.C. § 1115(b).

33 To prevail, Hero must prove by a preponderance of the evidence that Nutraceutical's use of "Yummy Gummy" on the KAL DINOSAUR products is likely to cause consumer confusion as to the source, affiliation, connection, or association of the products. *See* 15 U.S.C. §§ 1114(1)(a); 1125(a).

34 "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of

the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). It is Hero's burden to demonstrate that confusion by an "appreciable number" of consumers is "probable," not merely "possible." *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

35. Hero's state statutory and federal unfair competition claims are "substantially congruent" to its trademark infringement claims. *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994). Under both claims, the "ultimate test" is "whether the public is likely to be deceived or confused by the similarity of the marks." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).

36. The Ninth Circuit applies the following *Sleekcraft* factors in assessing "likelihood of confusion": (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). "These factors are flexible, merely guiding the analysis of the overall likelihood of confusion[.]" *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Communications, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999).

37. *Strength of Hero's Mark*

   37.1 "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Id.* at 1058. The "'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Conceptual strength is measured along a spectrum of generally increasing inherent

distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "Commercial strength is based on actual marketplace recognition, and thus advertising expenditures can transform a suggestive mark into a strong mark." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (citations and quotations omitted).

37.2 Although two of Hero's trademark registrations are "incontestable," "[a]n incontestable mark may . . . still be relatively weak for likelihood of confusion purposes[.]" *Gerawan Farming, Inc. v. Prima Bella Produce, Inc.*, 2011 WL 3348056, at *17 (E.D. Cal. Aug. 2, 2011); *see also Entrepreneur Media*, 279 F.3d at 1143, n.3 (noting that while incontestable status establishes the validity of the mark, it "does *not* require a finding that the mark is strong"); *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F. 2d 166, 171 (5th Cir. 1986) ("Incontestable status does not make a weak mark strong.").

37.3 Conceptually, the "yummi" portion of the YUMMI marks is descriptive of the good-tasting nature of the product. Hero's witness admitted that Hero uses "yummi" (albeit spelled with an "i") for its ordinary dictionary meaning. *See e.g., Entrepreneur Media,* 279 F.3d at 1142 (holding that "ENTREPRENUER" as a magazine title is descriptive, despite not directly stating that the product is a magazine, because "an entirely unimaginative, literal-minded person would understand the significance of the reference"). Accordingly, the YUMMI and YUMMI BEARS marks are conceptually weak, as it takes little to no imagination to understand the significance of the reference.

37.4 The Ninth Circuit has recognized that the strength of a suggestive or descriptive mark can be bolstered by its commercial success (*M2 Software*, 421 F.3d at 1081), extensive advertising, length of exclusive use and public recognition. *Brookfield*, 174 F.3d at 1058 (advertising expenditures can transform a suggestive mark into a

|   |   |   |
|---|---|---|
| 1 |  | strong mark). Hero's advertising and marketing efforts and commercial success |
| 2 |  | bolster the strength of the mark. |
| 3 | 37.5 | But extensive use of similar marks by third-parties reduces the commercial |
| 4 |  | strength of a mark. *Id.* at 1143*; see also M2 Software,* 421 F.3d at 1088. The |
| 5 |  | extensive third-party use of gummies, bear shapes, and "YUM"-formative marks |
| 6 |  | in the marketplace for childrens' vitamins undermines the commercial strength of |
| 7 |  | Hero's marks. *See, e.g., Entreprenuer Media,* 279 F.3d at 1143-44 ("[T]hat the |
| 8 |  | marketplace is replete with products using a particular trademarked word indicates |
| 9 |  | not only the difficulty in avoiding its use but also, and directly, the likelihood that |
| 10 |  | consumers will *not* be confused by its use."); *Miss World (UK) Ltd. v. Mrs. Am.* |
| 11 |  | *Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (in a crowded field |
| 12 |  | "customers will not likely be confused between any two of the crowd and may |
| 13 |  | have learned to carefully pick out one from the other"). |
| 14 | 37.6 | As stated, Hero presented no direct evidence, such as a consumer survey, to show |
| 15 |  | if, or how strongly, the market recognizes its trademarks. |
| 16 | 37.7 | The Court concludes that YUMMI and YUMMI BEARS are relatively weak |
| 17 |  | marks that are entitled to a narrow scope of protection. *See, e.g.*, *Matrix Motor* |
| 18 |  | *Co. v. Toyota Jidosha Kabushiki Kaisha,* 290 F. Supp. 2d 1083, 1091 (C.D. Cal. |
| 19 |  | 2003) (evidence of six uses of MATRIX in racing field shows that mark is |
| 20 |  | exceedingly weak and entitled to "very limited scope of protection"); *Glow Indus.,* |
| 21 |  | *Inc. v. Lopez,* 252 F. Supp. 2d 962, 990-92 (C.D. Cal. 2002) (finding GLOW to be |
| 22 |  | relatively weak given the exceedingly crowded field of beauty products using the |
| 23 |  | word "glow"). |
| 24 | **38** | *Proximity of the Goods* |
| 25 | 38.1 | "Where goods are related or complementary, the danger of consumer confusion is |
| 26 |  | heightened." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th |
| 27 |  | Cir. 1992); *see also Sleekcraft,* 599 F.2d at 348 (concluding that high-speed |
| 28 |  | waterskiing racing boats are sufficiently related to family-oriented recreational |

1       boats that the public is likely to be confused as to the source of the boats).
"Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Sleekcraft*, 599 F.2d at 348 (citations and quotations omitted).

    38.2 Here, both products are bear-shaped gummy vitamins and target substantially the same consumer. The products are clearly related.

    38.3 The Ninth Circuit applies a "sliding scale approach as to the weight that relatedness will carry dependent upon the strength of the trademark holder's mark" in order to take into account the fact that consumers may well recognize that companies use descriptive terms for what they mean, not because of an association with any one company. *Entrepreneur Media*, 279 F.3d at 1148. This sliding scale avoids the undesirable result of "prevent[ing] the commercial use of descriptive words to name products, as straightforward names are often the most useful identifiers." *Id*.

    38.4 This factor weighs modestly in favor of a likelihood of confusion.

39 *Similarity of the Marks*

    39.1 "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. When determining the degree of similarity, courts should consider "the context of other identifying features," *Surfvivor, Inc. v. Survivor Productions*, 406 F.3d 625, 633 (9th Cir. 2005), and must consider the marks "in their entirety and as they appear in the marketplace." *M2 Software*, 421 F.3d at 1082.

    39.2 Hero has always used bears (both word and cartoon) on its packaging. There are no bears or the word "bear" on Nutraceutical's label. Instead, its prehistoric-themed label features dinosaurs, consistent with its DINOSAURS mark. Hero's label prominently features the YUMMI BEARS mark. Nutraceutical's label focuses on the DINOSAURS mark.

39.3 The only clear similarity between the labels are the words "Yummy" and "yummi," which are pronounced the same. But the words are colored, spelled, and capitalized differently.

39.4 Both parties' labels always contain their respective HERO and KAL house logos, which are not similar and serve to further distinguish the marks and products, making confusion even less likely. *See, e.g., Petsmart,* 281 F.3d at 842.

39.5 Although both parties' products are gummy bears, there are several third parties that also use the gummy bear form for children's vitamins. Despite such third-party use, Hero submitted no evidence that customers associate gummy bears with Hero, specifically. Hero has not asserted rights to the bear shape or the gummy form, which are ubiquitous.

39.6 The Court concludes that while the words "yummy" and "yummi," standing alone, are similar in sight, sound, and meaning, the dissimilarities in the designs, themes, layouts, and respective house marks between the two product labels renders the marks dissimilar and easily distinguishable.

39.7 This factor weighs strongly against a likelihood of confusion.

40 *Evidence of Actual Confusion*

40.1 "Evidence of actual confusion is relevant to the issue of likelihood of confusion, but the absence of such evidence need not create an inference that there is no likelihood of confusion." *E. & J. Gallo Winery*, 967 F.2d at 1292. "Because of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive." *Sleekcraft Boats*, 599 F.2d at 353. "Consequently, this factor is weighed heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available." *Id.*

40.2 Actual confusion can be established by (1) producing the testimony of consumers that have been confused; or (2) producing a consumer survey that shows

11

consumers are actually confused. *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).

40.3  "[L]ack of evidence about actual confusion after an ample opportunity for confusion can be a powerful indication" that there is no meaningful likelihood of confusion. *Matrix Motor,* 290 F. Supp. 2d at 1093; *see also Brookfield*, 174 F.3d at 1050 ("We cannot think of more persuasive evidence that there is no *likelihood* of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what.").

40.4  Despite years of concurrent sales, Hero has presented no evidence of actual confusion.

40.5  This factor weighs against a likelihood of confusion.

41   *Marketing Channels Used*

41.1  The parties do not dispute that the products are sold in essentially the same trade channels.

41.2  This factor weighs in favor of a likelihood of confusion.

42   *Type of Goods and the Degree of Care Likely To Be Exercised By the Purchaser*

42.1  A consumer exercising a great deal of care would be less likely to be confused as to the source of the product. "In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media,* 406 F.3d at 634 (internal citation omitted).

42.2  "Courts have found that the ordinary purchaser presumably takes more care in purchasing "expensive" items that she buys infrequently, than in buying everyday, relatively inexpensive items." *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F. Supp. 2d 1271, 1280 (C.D. Cal. 2008) (citing *Sleekcraft,* 599 F.2d at 353). Vitamin supplements are relatively inexpensive items. The suggested retail price for the disputed products ranged from about $12 to $30.

|   |   |   |
|---|---|---|
| | 42.3 | But both parties sell their products at health and natural food stores, where consumers are more likely to pay attention to the types and quality of the supplements they purchase. This is particularly true for nutritional supplements that parents are selecting for their children. Nutraceutical's witness testified that products sold at such stores are also typically more expensive than comparable products available in the mass market retail channels. Hero further testified that in some instances, consumers are aided by a knowledgeable sales associate when choosing which dietary supplement will best address their children's needs. |
| | 42.4 | Such health-conscious, educated customers shopping in higher-priced stores for dietary supplements for the physical well-being of their children "would take the time to distinguish between the two product lines." *Surfvivor Media,* 406 F.3d at 634 (internal citation omitted). Such customers are thus less likely to be confused between competing products. *See, e.g.*, *Nature's Best, Inc. v. Ultimate Nutrition, Inc.*, 323 F.Supp.2d 429, 434 (E.D.N.Y. 2004) ("[C]onsumers selecting products or treatments that affect their physical appearance and health are likely to exercise a great deal of care. . . . . Indeed, it seems highly unlikely that confusion between . . . two nutritional supplements will occur[.]") (citation and quotations omitted). This is particularly so given Hero's witness's testimony that Hero's customers actually read the product label or do research before purchasing. |
| | 42.5 | On balance, this factor weighs against a likelihood of confusion. |
| 43 | | *Defendant's Intent in Selecting the Mark* |
| | 43.1 | "When the alleged infringer knowingly adopts a mark similar to another's, we must presume that the public will be deceived." *M2 Software, Inc.*, 421 F.3d at 1085. |
| | 43.2 | Nutraceutical was aware of Hero's use of the YUMMI and YUMMI BEARS marks when it began marketing and selling its Yummy Gummy products. |

43.3 But Nutraceutical's use of "Yummy Gummy," is not sufficiently similar to Hero's use of YUMMI and YUMMI BEARS to warrant a presumption that Nutraceutical chose its marks to deceive the public.

43.4 This factor is neutral.

44 *Likelihood of Expansion of the Product Lines*

44.1 Where two companies are direct competitors, the "likelihood of expansion" factor is unimportant. See *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137, 1153 (9th Cir 2011).

44.2 Here, the parties already directly compete, and thus this factor is neutral.

45 *Conclusion on Sleekcraft Factors*

45.1 The balance of the *Sleekcraft* factors does not demonstrate a likelihood of confusion between Hero's marks and Nutraceutical's use of "Yummy Gummy." Hero's marks are weak and entitled only to a narrow scope of protection. Although the words "Yummy" and "yummi" are similar, the overall impression of the marks, including the packaging, labeling, designs, and house marks, are dissimilar. Consumers of children's vitamins at health food stores tend to be more careful and discriminating than the average shopper. Despite years of coexistence in the market, there was no showing of actual confusion, nor has Hero offered a survey to show actual confusion. Other than knowledge of the YUMMI BEARS mark, Hero has made no showing that Nutraceutical's use of "Yummy Gummy" was done in bad faith with an intent to trade off of Hero's good will. Although the products at issue are competitive and are generally sold in the same trade channel, these factors do not outweigh the other considerations leading to the ultimate conclusion that there is no likelihood of confusion.

45.2 The Court concludes that Hero has not met its burden of proving a likelihood of confusion between its use of YUMMI BEARS and Nutraceutical's use of "Yummy Gummy."

46  Hero has similarly failed to show post-sale confusion. Hero has not shown that it has any rights to the shape, size, color, and texture of the vitamins themselves, and the demonstrated similarities in those characteristics are insufficient to establish post-sale confusion.

47  In sum, Nutraceutical's use of "Yummy Gummy" was not "likely to confuse an appreciable number of people as to the source of the product." *M2 Software, Inc., a Delaware corporation v. Madacy Entm't, a corporation*, 421 F.3d 1073, 1085 (9th Cir. 2005) (quoting *Entrepreneur Media, Inc.*, 279 F.3d at 1151.)

48  The Court further finds overall, after reviewing all relevant facts and law, and particularly reviewing the credibility of the witnesses, that Defendants presented a much stronger case.

**DISPOSITION**

The Court finds against Hero on its claims for trademark infringement and unfair competition and denies all of Hero's requested relief.

Nutraceutical's counsel is directed to prepare the judgment and promptly file and serve it on Hero. Hero shall have 14 days from the date of service of the proposed judgment to file any objections to the proposed judgment. If no objections are received within 14 days, the judgement will be entered immediately, and Federal Rule of Civil Procedure 52(b) will apply on entry of the judgment.

IT IS SO ORDERED.

DATED: August 16, 2013

_____
Andrew J. Guilford
United States District Judge